Allen, J.
The 12th section of the constitution of the Cincinnati Society, provided, that the funds of each State meeting shall be loaned to the State, by permission of the Legislature; and the interest only, annually to be applied to the purposes of the society; and if in process of time, difficulties shall occur in executing the intentions of the society, the Legislatures of the several States shall be requested to make such equitable dispositions as may be most correspondent with the original design of the institution.
It appears by the circular of the general to the Slate societies, of the 3d May 1784, referred to in the argument, that one of the leading motives for the adoption *154 of this provision of the constitution, was to remove all causes of jealousy and suspicion, by letting the Legislatures see the application of the funds was to the best purposes. The circular further directed, that the Legislatures should be solicited to grant charters; and the 6th section of the amended constitution contains a similar provision. The whole scheme, as contained in the amended constitution, embraced the loan or deposit of the money with the States; the management, control, and disposition of the funds by charter; a restriction that interest only should be annually disbursed; and a provision for the present security, and ultimate destination of the funds, when difficulties should occur by the death of members, in executing the intentions of the society. No charter was applied for or granted in Virginia. The society, as such, continued to manage its funds; and they were not loaned to the State. In this condition of affairs, the society adopted the resolutions of the 16th December 1807. By these resolutions, the standing committee was required to declare, when from death or removals, the society should be so reduced as to prevent a general meeting for the space of three years, that the difficulties contemplated by the 12th section of the constitution had occurred. The resolutions then proceed to make an ultimate disposition of the funds, when that fact shall have been declared; provide that when such transfer of the funds shall be made, existing pensions charged thereon shall continue charged and paid; and that'the General Assembly should be solicited to pass a provisional law for carrying into effect the preceding resolutions. The first question that arises upon these provisions of the constitution, and the resolutions of the society, is as to the mode they contemplated and provided for the ultimate disposition of their funds. Was an immediate and direct transfer of the funds to the college intended ? or did they look to the mode pointed out in the 12th section of the constitution, by a loan to the *155 State, and an appropriation of the funds for the purposes contemplated, through the instrumentality of legislative provisions ? The cotemporaneous expositions, both by the society, and its agents, and the Legislature, evince the understanding of all, at that time, that the latter mode was the one contemplated.
The funds were not given to the college absolutely, but upon the express condition that there should be established and continued a military school; and on failure of this condition, the funds were to be vested in the Commonwealth, to be applied by the Legislature, on like conditions, to some other seminary. This condition, upon which the endowment depended, was precedent so far as respected the establishment of the military school; it was subsequent as to its continuance. Whether under the charter, the college could have established such a professorship or not, is not, as it seems to me, material to the enquiry. The resolution looked to some legislative provision regulating the endowment; and securing the continued, appropriation of the funds either there or in some other seminary, to the object in view'. And to secure such appropriation, and the payment of the pensions charged on the interest, in the interval, the funds, according to the 12th section of the constitution, were to be paid to the State. If this was not the intention of the society, why was the Legislature to be solicited to pass any provisional law on the subject ? The college was incorporated, capable of receiving the donation, liable for the charges on it, and if, as has been argued, it was not precluded by the amended charter from adding another professorship to the four thereby provided for, there would seem to have been no necessity for the intervention of the Legislature, if the sole object had been to transfer the funds to the college. The fact that such law was to be applied for, proves that the society contemplated the transfer in the mode pointed out by the 12th section of the constitution, by a loan to the State *156 and a legislative sanction to the ultimate destination of the funds. So understanding their resolutions of 1807, application was made for the passage of the provisional law thereby contemplated; and the act of February 5th, 1814, was passed. It recites the resolutions, the 12th section of the constitution, and the application for the law; and then directs and requires the treasurer to receive into the public treasury the funds of the society; and enacts that the funds shall be held by the Commonwealth upon the terms set forth in the resolutions of the society, and 12th section of the constitution, subject to the future resolutions of the society; and furthermore directs the treasurer to pay the pensions charged on the fund, and any other charge of said society; frovided the same shall not exceed the annual interest on the fund; according to the 12th section of the constitution. The act, by referring in the preamble to the 12th article of the constitution, in connection with the resolutions, and in the second section, by limiting the payments on account of pensions or other charges, to the annual interest, clearly indicates the meaning and intention of the Legislature to receive the funds, and hold them for the purposes of the society, according to the provisions of the 12th section of the constitution. When they should be received into the treasury, the State assumed the obligation to preserve them, to pay the pensions and demands of the society, to hold them subject to the future resolutions of the society, and to dispose of them in pursuance of such resolutions, or if none should be made, then according to the resolutions of the 5th February 1807.
Whether the Commonwealth had such an interest in the ultimate destination of the funds as to entitle her to receive them into the public treasury, is not a subject for our enquiry. She has agreed to receive them for those purposes. She has assumed the responsibility of seeing that they shall be so disposed of, and this obligation is *157 sufficient to entitle her to recover the money, and preserve the funds for the ultimate objects of the trust. Reference has been made to subsequent proceedings of the standing committee and the society, to shew that by some subsequent acts of the society, or the committee, the destination of the funds was changed, so far as to require a direct transfer to the college. The standing committee would seem to have had no authority to change the disposition of the funds. That could only be done by the society; and the acts of the society at their meetings in December 1813, and December 1818, the first directing application to be made for the law; and the last, after its passage, refusing to alter the disposition of the funds, evince a determination to carry out the resolutions of 1807; and shew that the law which had been enacted, was regarded as conforming with the resolutions as understood by the society.
The standing committee, in their resolutions of the 19th December 1822, did not contemplate a different disposition of the funds from that previously prescribed. Their action was grounded upon the resolutions of 1807; and their proceedings must be construed with reference to those resolutions and the subsequent law. They speak of the time having arrived when according to those resolutions the funds should be transferred; and as the college had announced its willingness to receive the funds on the conditions stated in the resolution, they direct a transfer to the college not only of the funds, but of the books and records of the society by a deed, and that a copy of the assignment, with the resolutions of 1807, should be recorded in the county of Rockbridge. The reference here again to the resolutions of 1807, shews that no change in the disposition of the funds was contemplated. If a literal compliance with the last resolution would have involved a violation of the resolutions of 1807, it would have been the duty of the agent to conform to the provisions of the previous resolutions, *158 and the law, by delivering the funds to the treasurer. But it would be doing violence to the resolution' of the standing committee to give it a construction which would defeat the resolutions of 1807, when upon the face of the resolution, they declare they are acting in accordance with the spirit of these resolutions. The college was, by the standing committee, constituted the final depositary of the books, records and papers of the society. The transfer and assignment directed by their resolution, extended to these articles, as well as the funds ; and the assignment they directed, was merely intended to preserve record evidence of all the resolutions, orders and proceedings, which resulted in making the college the beneficiary of the society, and depositary of all its records. •
It seems to me, therefore, that the society looked to a transfer of its funds to the treasury, by the resolutions of 1807, in conformity with the 12th article of the constitution, provided the Legislature would authorize it. That to effect this object, the resolution of 1813, directed an application to be made for the law. That after the law passed, the resolution against any alteration in the former disposition of their funds was a confirmation of the law; and that the subsequent proceedings of the standing committee were intended to carry out those resolutions of the society, and not to change them. I therefore think the agent who had the funds under his control was authorized by the acts of his principals, in making the transfer to the Commonwealth. And further, that as the Commonwealth agreed to receive the funds; and came under an obligation to apply them according to the dispositions of the society, she has an interest in the subject which authorizes a proceeding at her instance for their recovery.
It is objected that the agent did not pursue the mode of transfer prescribed by the standing committee. It was not done by deed. This, it seems to me, is a ques *159 tion not arising as between these parties. The law authorized the receipt of these funds. The agent having them under his control has transferred them. His principals raise no objection to the mode. If the treasurer was bound to receive and has received the specific funds, he becomes accountable. But the resolutions of 1807, and the law authorizing the receipt into the treasury, are silent as to the form to be pursued by the agent in paying or transferring them. Whenever they reach the treasury, by the transfer of one having control of them, they are there under the resolutions of 1807, and the law ; and are to be held by the Commonwealth upon the terms set forth in the resolutions.
If then the resolutions authorized a transfer of these funds to the Commonwealth, and it was the duty of the treasurer, under the law of 1814, to receive them into the public treasury, it becomes necessary to enquire whether they were ever received into the treasury. The first acts of Baker are evidenced by his two receipts, the first dated “ Treasury office, 13th October 1824,” and the second dated 11 Richmond, 26th July 1826.” The first and principal receipt, was endorsed on a copy of the act of 1814; sets out that in conformity with its provisions, he received of Maj. Gibbon, the following certificates of stock belonging to the Cincinnati Society; and is signed by him in his official character as treasurer. The second receipt is signed by him as treasurer and trustee of the Cincinnati Society. In executing these receipts, did he act officially, and receive these funds by virtue of his office, having legal authority to receive, them; or was it a receipt under colour of his office, under a pretence of legal authority when he had none ? The condition of the treasurer’s bond requires that he shall faithfully account for all moneys or other things which shall come to his hands by virtue of his office, and perform all other duties thereof according to law. The law contemplates that the treasurer may have the *160 custody of other things, the property of the Commonwealth, than money. For these, as well as moneys in the treasury, he is made accountable. The act of 1814 authorized and required the treasurer for the time being to rece^7e into the public treasury the funds of this society. These funds did not consist of money, but certificates of stock, evidences of debt. The receipt of the funds then was legal. He was required by law to receive them into the treasury; and when, as treasurer, he receives them, says he receives them in conformity with the act, and that act requires the receipt to be into the treasury, is it not clear that he regarded it as a receipt into the treasury ? The addition of the words, “ that he as treasurer received the funds into the treasury,” would not more clearly express the intention with which the agent transferred, and he received, than is imported by the words used. Was it essential to charge Baker officially, and consequently his official sureties, that these funds should have been audited. The law declares that it shall not be lawful for the treasurer to pay or receive any money on account of the public, but on warrant or certificate of the auditor. These funds were received by Baker without any warrant of the auditor to receive them into the treasury, nor was any account of the transaction raised in the books of the auditor’s or treasurer’s office.
It seems to me the provisions of law touching the auditing of accounts, and prohibiting the payment or receipt of any money except on warrant of the auditor, cannot be made to reach a case where no money is received or paid-. The value of the subject was uncertain. It might have consisted of plate, jewels or other articles. How could such a subject be audited and the amount certified to the treasurer ? The auditor might have given a warrant specifying the articles of property, whatever they were, and a receipt could have been given for them. But the law made this no part of the audi *161 tor’s duty. It speaks of money alone. If, therefore, the auditor was not bound to audit, the receipt without a warrant was regular. But if this was not so: If the funds shouldffiave been audited, and this has not been done, how does that affect the case ? If the law required an audit to justify the receipt into the treasury, the treasurer violated his duty and was guilty of a breach of his official bond; for that binds him to perform all other duties of his office. He was bound to receive these funds into the treasury. If the law required an audit, it was a violation of duty to have received them without the audit. 1 do not perceive how he can be permitted to object that though the funds are in the treasury, are funds belonging to, or for which the Commonwealth is responsible, and as such, under his control as treasurer ; still they are not funds for which he is officially responsible, because they were irregularly received. The argument that the treasurer could not bind his sureties by giving his receipt as treasurer for money borrowed by him, or effects deposited in his hands, is certainly true; but has but little if any bearing on this question. In the case supposed, the Commonwealth has no interest in the subject. But if a public debtor, or collector, or agent, has in his hands a sum of money; the property of the Commonwealth, receivable into the public treasury, and through mistake or ignorance, he pays it over to the treasurer, who receives it into the treasury without audit, would not the treasurer be responsible ? The debtor might not be discharged; the money being irregularly paid he could not obtain a quietus ; but would the Commonwealth be compelled to resort to him for payment ? Would not good faith require her to pursue her own officer, who had thus irregularly received the fund ? And would it be competent for him to rely on a breach of his duty in receiving, to relieve him from his obligation to account: to discharge a latter official delinquency, by setting off against it a prior one? And where would *162 such enquiries lead us ? Suppose in this case the treasurer who received, and the treasurer who converted were different individuals, and officially the officers may be so considered here. A treasurer then, in pursuance of this act of 1814, received into the treasury without audit, and therefore, let it be conceded irregularly, these funds of the society. When received they were to be held by the Commonwealth. They are so held by the treasurer who received, and he passes them over unchanged to his successor. Is he not responsible, and responsible officially, for them ? Could he be permitted to allege the irregularity of his predecessor as relieving him from his official liability ? It would not be pretended in such case that he was not responsible on his bond. But is not that the case before us ? Baker received these funds, except the note for 60 dollars for which the second receipt was executed, on the 13th October 1824. So far as the record discloses, the funds remained in the treasury unchanged during the residue of his then term of office. They passed into his hands the succeeding year, and though, in the first instance, they may have been irregularly received into the treasury, when they reached the treasury, they were held by the Commonwealth precisely in the same condition as if they had been transferred to her in absolute property. As part of the funds of the Commonwealth they went into Baker's hands under his new appointment. Being in the treasury, they came to his hands, by virtue of his office, and he was bound by the condition of his bond to account for them. Instead of holding and accounting for them, he, during the year 1825, converted the greater part into cash.
It has been argued, the law requiring the audit is for the benefit of the sureties; they contract with reference to it, and have a right to require the evidence furnished by audit before they can be charged.
The law, it seems to me, is a fiscal regulation, for the convenience and safety of the Commonwealth. If the *163 argument were sound, the provisions of the law would constitute part of the terms of the contract; and would be unalterable during the treasurer’s term of office. The law now requires the payment of money to be made in bank on the certificate of the treasurer. It might with as much propriety be contended the sureties contract with reference to this law, and therefore a change could not be made. The contract of the sureties is that the treasurer shall faithfully account for all moneys and other things which shall come to his hands by virtue of his office, and perform all other duties thereof. The audit is one mode of shewing what money has come to his hands by virtue of his office; but it is competent for the Legislature to dispense with it entirely, and then other evidence must be offered. The law requiring the audit does not, therefore, enter into the contract of the surety. If, by other evidence, it is shewn that money has come to his hands by virtue of his office, it is covered by the condition of his bond. A different construction would be holding out inducements to a faithless officer to get possession of the funds of the Commonwealth irregularly, so as to relieve his sureties. I therefore do not think the failure to audit these funds can be relied on by the defendants in either of the bonds as protecting them from liability.
The agreement of facts submitted to the Court below to decide whether the respective sureties of Jerman Baker, bound in his official bonds for the years 1825, and 1827, wmre liable for the sums of 5778 dollars 16 cents, and 2265 dollars 60 cents, with interest from the first days of January 1826 and 1828, or for either of those sums, or for any part thereof,- and if so liable, for how much respectively.
The Court gave judgment against the sureties of 1825 for the larger sum, and against those of 1827 for the other sum, with interest as aforesaid; and it is insisted the Court has distributed the liability and applied the *164 credits improperly. As this branch of the case was merely adverted to in the argument, I have had some difficulty in satisfying myself from the agreement of facts, as to the scheme of the account. It appears from the memoranda left by Baker in the office, and admitted to be correct, that in the year 1825, he received from the certificates of stock, the funds of the society, the sum of 10,544 dollars 16 cents. This was a conversion during that year, for which the sureties in the official bond of 1825 were liable, except so far as it can be reduced by disbursements applicable thereto. In 1826, there was no conversion, but in 1827 he seems to have converted, and received as dividends sums amounting to 2925 dollars 60 cents; for which, so far as unaccounted for, the sureties of that year were responsible.
There were disbursements in payment of pensions, and for the purchase of bank stock, in each of the years from 1825 to 1828, inclusive. The disbursements of the year 1825, amounting to 3926 dollars, were properly applied to the liability of that year, reducing it from 10,544 dollars 16 cents to 6618 dollars 16 cents; and if I understand the mode by which the sum for which judgment was given was arrived at, this sum of 6618 dollars 16 cents, was further credited by the disbursements of 1827 and ’28, deducting therefrom the 60 dollars, the amount of Nelson’s note. The disbursements of those two years amounted to 900 dollars. Deducting therefrom the 60 dollars, there remained 840 dollars to be credited, which left 5778 dollars 16 cents, the sum for which the judgment was rendered.
So stating the account, the 60 dollars, the amount of Nelson’s note, must have been deducted from the conversion of 1827, and charged to the year 1825, or which is the same thing, deducted from the credits applied to that year. The sum converted in 1827, including the 60 dollars, amounted to 2925 dollars 60 cents; deducting the 60 dollars, and the disbursements of 1826, for which credit *165 seems to have been given to that year, and there remains 2265 dollars 60 cents, for which the sureties of that year were held responsible. If this was not the mode by which the several sums were arrived at, I have not been able to discover it: and I infer it was the mode be-1 cause the result arrived at agrees. But I am not satisfied with its correctness upon principle. The sureties of 1825 were properly held liable for the sums converted during that year, 10,544 dollars 16 cents; and properly credited with the disbursements during the same year, amounting to 3926 dollars, reducing their liability to 6618 dollars 16 cents. There was no conversion in 1826.
The treasurer held stocks upon which interest was accruing, and received by him. There were pensions chargeable on the annual income. The sureties of 1826, if there had been any conversion during that year, as they could only have been responsible for the funds in his hands, would have had a right to insist upon the application of the income from the fund to the disbursements chargeable for that year on that income. And so the sureties of 1827 would have the same right to consider so much of the income accounted for. It was therefore proper to apply the disbursements of 1826 to the liability of 1827, as seems to have been done; that liability being in part made up of 1265 dollars 60 cents, dividends on stocks, besides Nelson’s note for 60 dollars. But I can see no reason for throwing the 60 dollars, Nelson’s note, on the year 1825, as was done by charging it to that year, or deducting it from credits applicable to that year. The note was delivered to Baker in July 1826, and is charged to him in the memoranda as received in February 1827; and was therefore chargeable to that year. As to the credits, for the same reason that the sureties of 1827 were entitled to a credit for the disbursements of 1826, they are equally entitled to a credit for the disbursements of 1827. They are credited with the disbursements of 1826, because those disbursements *166 were a charge on the income of the fund unconverted. That income from dividends in 1827, is charged at 1265 dollars 60 cents, more than enough to cover the disbursements of both years. I think, therefore, they should have been credited with the disbursements of 1827, equal to 550 dollars.
As there were no receipts in 1828, the disbursements of that year must be applied to 1825, that being the first liability, and no application of the credit having been made by the debtor. The account so stated will stand as follows:

As to interest, it seems to me, it was properly charged to the sureties; the money was converted in 1825, and 1827, and since then, is unaccounted for. The act of conversion was illegal. Before that time an income was derived from the funds, and the interest should be charged from the end of the year, on the balance converted in that year, and unaccounted for.
As to the sureties for 1825, the Court, I think, erred in their favour, by rendering a judgment against them for *167 6778 dollars 16 cents, instead of 6268 dollars 16 cents, for which error, under the rule adopted 2d October 1811, (see Day v. Murdoch, 1 Munf. 460,) the judgment must be reversed, and judgment entered for 6268 dollars 16 cents, with interest from 1st January 1826, until paid.
As against the sureties of 1827, there was error in rendering judgment against them for 2265 dollars 60 cents, instead of for 1775 dollars 60 cents, for which error, the judgment should be reversed and judgment entered for the latter sum, with interest from the 1st January 1828 until paid.
Baldwin, J. concurred in opinion with Allen, J.
Cabell, P. dissented. He was of opinion that the judgments should be reversed, and judgments entered on the special verdicts for the appellants.